IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-01905-WYD-MJW

MAURICE D. MCDONALD,

     Plaintiff,

v.

KEN SALAZAR, Secretary, United States Department of the Interior,

     Defendant.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

     THIS MATTER comes before the Court on cross motions for summary judgment. "Defendant's Motion for Summary Judgment and Memorandum Brief in Support Thereof" was filed on October 23, 2009, and seeks summary judgment on all claims asserted in the case.  Plaintiff's Motion for Summary Judgment was filed on November 24, 2009, and seeks summary judgment only on the fourth and fifth claims for relief which are appeals of decisions of the Merit Systems Protection Board ["MSPB"].

     As to the fourth and fifth claims for relief, I note that those claims are subject to resolution on the administrative record and will not be addressed at the upcoming trial set to commence Monday, December 13, 2010.  I also note that Plaintiff addressed his arguments regarding the fourth and fifth claims in connection with his summary judgment motion, and not in his response to Defendant's motion.  Accordingly, I deny Defendant's Motion for Summary Judgment without prejudice as to the fourth and fifth

claims, and will address those in connection with a separate order on Plaintiff's Motion for Summary Judgment. I will, however, consider arguments made in Defendant's motion in resolving those claims.

I now turn to the discrimination claims which are at issue in Defendant's motion. Plaintiff Maurice McDonald ["McDonald" or "Plaintiff"] asserts claims of gender discrimination, age discrimination, and retaliation. For the reasons discussed below, I deny Defendant's Motion for Summary Judgment as to all three claims of discrimination.

II.    FACTS

At the outset, I note that where appropriate, I have construed the facts in the light most favorable to Plaintiff as I must for purposes of this summary judgment motion. *See Cordova v. Aragon*, 569 F.3d 1183, 1186 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1146 (Jan. 19, 2010). Many of the facts are, however, undisputed. Where the record is or could reasonably be disputed, I have cited to the record where applicable. I have also omitted facts that are unsupported or conclusory or, in my opinion, not material to the motion. I now turn to the relevant facts.

McDonald was born on May 20, 1945, making him 65 years old. For purposes of this dispute, he is a male over the age of 40. McDonald was employed by the Department of Interior's ["DOI"] National Business Center ["NBC"] as a Supervisory Accountant (Chief of Fiscal Services Branch) from December 1, 2002, through June 25, 2006. During that time, the NBC was a separate organization under the DOI that existed to provide fee for service, payroll, administrative, accounting, fiscal, and property management functions to other federal agencies.

Prior to working at the NBC, McDonald served 26 years on active duty in the United States Air Force working in accounting, finance and budget. His final position in the Air Force was Deputy for Operations in the Cash Accountability Office where he supervised five GS-12 accountants and managed a staff of over 120 people. McDonald became a federal civilian employee in 1991. He worked as a Supervisory Accountant in the Bureau of Reclamation from January 1993 through March 1995, and as a Supervisory Debt Management Specialist from April 1997 through August 2000.

McDonald came to work in the Accounting Operations Division at the NBC in 2000. In 2005, he supervised 16 federal employees and 17 contract employees at the NBC. During his employment, McDonald received monetary awards for good performance, including awards in January and September 2004. Until 2006, McDonald's annual salary steadily increased from $65,837 in January 2000 to $91,771 in January 2006. His performance evaluation for the period October 2003 through September 2004 gave him the highest ranking possible. McDonald also cites testimony of coworkers and supervisors praising his work philosophy and assets, supervisory skills, and character. (Pl.'s Resp. ¶¶ 53-58.)

The NBC was reorganized in 2003, which increased the workload on Plaintiff's branch. In October 2004, Connie Sanborn ["Sanborn"], a female over the age of 40 in 2005 but younger than Plaintiff, became his supervisor. McDonald began to have workplace concerns with Sanborn in late 2004 or early 2005. (McDonald Dep. 44:6-10, June 3, 2009, ECF No. 41-1.) He asserted that his workload increased significantly under Sanborn's supervision, and that the customer workload increased in 2005. Plaintiff first talked to Sanborn about the increased workload in the spring of 2005.

In 2005 the DOI implemented a five-level system of rating employees' performance from the previous pass-fail system. On March 10, 2005, McDonald was given and signed for an Employee Performance Appraisal Plan setting forth the critical elements upon which he would be rated. Critical elements are assignments or responsibilities given to an employee at the start of a performance year.

On June 9, 2005, Sanborn tasked McDonald's branch with correcting a number of deficiencies or discrepancies that had to be reconciled, many of which came from the Washington office or were years old. (McDonald Dep. 47:7-21.) This was referred to as the "get-well" plan. (*Id.*) The plan put a tremendous workload on McDonald's branch. McDonald believed Sanborn placed unrealistic demands upon him and his staff in connection with this plan.

In June 2005, Sanborn directed McDonald to develop a statistical sampling plan to review travel vouchers rather than to examine each one. (McDonald Dep. 61:10-12, ECF No. 50-1.) McDonald understood that this plan was to be done as quickly as he could. (*Id.* 62:8-10.) Sanborn's boss, Sandra Weisman ["Weisman"] wanted it done. (McDonald Dep. 67:11-15, ECF No. 41-1.) Sanborn understood that the sampling plan was to be completed in the time period from June to the middle of August. McDonald informed Sanborn that in order to prepare a statistical sampling plan, there had to be testing prior to implementation. McDonald was working on completing the statistical sampling plan during the month of July 2005. He delegated to Amanda Hardesty ["Hardesty"] the task of completing the plan, and Hardesty worked diligently on this.

On July 5, 2005, Sanborn had a meeting or "progress review" with McDonald to go over his midyear performance review. On July 6, 2005, Sanborn signed McDonald's

Progress Review, finding that critical elements 2, 4 and 5 were "unsatisfactory." (MSPB 805-88, Hr'g. Ex. D.)[1] Critical elements 1 and 3 were rated "Minimally successful." (*Id.*) McDonald alleges that Sanborn was unfairly critical and berating of his performance. He testified he was not surprised, however, by the evaluation because Sanborn had made it very clear that nothing he did was acceptable to her. (McDonald Dep. 69:20-24, 71:8-12, ECF No. 41-1.) McDonald chose not to dispute or present points about his performance in regard to the progress review. (*Id.* 70:20-24.)

McDonald gave Sanborn a draft of the statistical sampling plan on August 5, 2005. Sanborn then requested that August 8, 2005, be the date for the test period to begin. In response to Sanborn's request, McDonald requested until August 15, 2005, to start the testing (not to implement the plan.) In his request for more time to complete testing, McDonald explained that "[t]he testing process involves more time and record keeping at both technician and certifier levels. We also need to set up control sheets, etc." (MSPB 1035.) There is no document in the MSPB Record or otherwise indicating that Sanborn denied the request.

The statistical sampling plan was finalized and implemented on September 6, 2005. On September 12, 2005, Sanborn gave McDonald a letter of reprimand dated September 9, 2005, for failing to timely implement the statistical sampling plan and for his unprofessional and rude conduct during a meeting with her on July 5, 2005. This is despite the fact that Sanborn later admitted in her testimony before the MSPB that

---

[1] References to the "MSPB" record are to the Administrative Record in Merit Systems Protection Board Case No. DE-531D-08-0223-1-1 (related to the denial of within-grade) and DE-0432-08-02242-1-1 (related to the demotion). The testimony at the MSPB hearing was taken under oath. The Scheduling Order provides that the MSPB testimony "may be used with full weight and effect" in this case. (ECF No. 15 at pp. 20-21.)

McDonald had made his best efforts to get the statistical sampling plan completed on time.  (MSPB 1638:22-1639:2.)

McDonald contacted an EEO counselor on either September 8 or 12, 2005—this is unclear from the  record.  Construing the evidence in the light most favorable to Plaintiff, I will assume the earlier date of September 8, 2005 for Plaintiff's contact with an EEO counselor.  (McDonald Aff. ¶ 54, November 14, 2009, ECF No. 47-1.)

On September 12, 2005, Sanborn presented McDonald with a Performance Improvement Plan ["PIP"], the purpose of which is to give an underperforming employee an opportunity to improve before any subsequent action is taken regarding his performance.  The PIP faults McDonald for failing to meet four different critical elements.  While the Progress Review that Sanborn gave to McDonald on July 5, 2005 indicates that McDonald was "minimally successful" with respect to critical element number 1, the PIP indicated that he failed this element.  Further, the PIP faults McDonald for numerous issues that were not previously delineated in his Employee Performance Appraisal Plan.

After McDonald received the PIP, he believed it was a foregone conclusion that he would receive an unsatisfactory year-end performance evaluation.  However, he disputed the PIP and prepared a document explaining the increases in workload that his branch had experienced without a commensurate increase in staff.  Hardesty assisted McDonald in compiling some of the data for this document regarding workloads.  According to this document the increases in workload during 2005 were dramatic, including a 108% increase in travel payments processed.  These increases are outlined in more detail in Plaintiff's response brief at pages 11-12.  Also, emails compiled as part

of the MSPB Hearing Exhibit I (MSPB 997-1028) demonstrate that during 2005, the workloads in McDonald's area were increasingly overwhelming. Although workloads were increasing, there were fewer employees to do the work. McDonald testified extensively about the turnover in his branch and the significant negative impact that the turnover had on processing payment (resulting in delays and backlog).

Throughout 2005, McDonald made numerous requests for additional staffing. Sanborn admitted in her testimony before the MSPB that she was aware of turnover in McDonald's branch. (MSPB 1655:21). She also testified that everyone in McDonald's branch was overworked and overwhelmed during the time period of September and October of 2005. (*Id*. 1672:11-17.)

The PIP provides that "the time period of this Performance Improvement Review is for a minimum of 30 days from September 9, 2005, through October 10, 2005." (MSPB 1243, Hr'g Ex. TT.) Sanborn testified that the PIP expired on October 10 "unless further documentation extended it." (MSPB 1664:12-14; 1665:12-14.) The agency has not produced any document extending the PIP before it expired on October 10, 2005. Further, Sanborn testified that she did not prepare any document extending the PIP. (*Id*. 1666:9-1167:16.) The PIP states, "If after the 30-day performance opportunity period your performance is not at an acceptable level, you will receive a letter within 30 days from the end date of the [PIP] identifying appropriate follow-up action, which could include reassignment, change to lower grade, or separation from the Federal service." (*Id*. 1243.) "If it is determined that your performance has improved to an acceptable level of competence, your Performance Improvement Plan will be discontinued." (*Id*.)

On November 17, 2005, after the 30 day period set forth in the PIP had expired, Sanborn gave McDonald a Memorandum titled "Extension of Performance Improvement". The November 17 Memorandum purports to extend the expired PIP through December 7, 2005, stating "if after the performance opportunity period your performance is not at an acceptable level, you will receive a letter within 30 days from December 7, 2005, identifying appropriate follow-up action. . . ." (MSPB 1255-56, Hr'g Ex. UU.) Sanborn testified that if McDonald did not receive a letter within 30 days from December 7, 2005, he could deem that his performance had reached an acceptable level. (MSPB 1669:4-7.) The agency has not produced any document written in the 30 days between December 7, 2005 and January 6, 2006, that discusses McDonald's performance not reaching an acceptable level. Further, Sanborn admitted that she did not provide any written document to McDonald indicating that his performance was deficient until January 9, 2006, more than 30 days after December 7, 2005. (*Id.* 1669:17-20.) On January 9, 2006, the PIP was terminated, ending the period on which McDonald was on the PIP. (MSPB 1258, Hr'g Ex. VV.)

On January 5, 2006, Sanborn announced that Kathy Shauvin ["Shauvin"] had been selected to fill the position of Chief, Departmental Offices Branch, effective January 22, 2005. Shauvin then became responsible for supervising the payments and collections group, which had previously been supervised by McDonald.

On January 9, 2006, Sanborn gave McDonald an Employee Performance Appraisal giving him an unsatisfactory performance rating for Fiscal Year 2005. The Appraisal ranked McDonald zero out of a possible five for four of the Critical Elements; namely, critical elements 1, 2, 4 and 5. The Appraisal ranked McDonald two out of a

possible five for critical element number 3.  Even though a ranking of two indicates that Sanborn felt McDonald was "minimally successful" in achieving the standards set by critical element number 3, Sanborn provided no explanation of why she felt McDonald was "minimally successful."  The Appraisal resulted in McDonald receiving a numeric ranking of 2 out of a possible 25.  Paula Lucey, Supervisor of the Human Resources Office, testified that she had never come across a lower numerical rating than the one given to McDonald on January 9, 2006.  A January 9 2006 Memorandum states that Sanborn "will be reviewing the options available."  (MSPB 1258.)

McDonald was given a Notice of Proposed Removal on February 27, 2006.  The Notice states that on July 6, 2005, Sanborn had informed McDonald that his performance fell below the minimally successful level for critical element number 1.  The Notice contradicts the progress review that Sanborn gave to McDonald on July 6, 2005, which indicates that he was minimally successful for critical element number 1. Weisman was not aware of this discrepancy.  McDonald objected to the Proposed Removal and submitted information in response to it to Weisman, his second line supervisor.  The latest day that McDonald submitted such responsive information was April 7, 2006.

Effective April 16, 2006, the agency denied McDonald a within-grade pay increase.  (MSPB 826.)  The denial of a within-grade increase was based on subjective shortcomings in McDonald's performance in 2005.  The agency recognizes a denial of within-grade increase as a form of discipline.

Plaintiff was not removed from federal service.  Instead, on June 12, 2006, McDonald was demoted or down-graded from a GS-13 to a GS-11.   As a result of the

demotion, McDonald's salary decreased from $91,771 annually to $56,378 annually. This is a reduction of $35,393 annually.

Pursuant to 5 C.F.R. 432.105(b), the Decision on Proposed Removal was due no later than May 8, 2006, as the last day that McDonald submitted responsive information to the Notice of Proposed Removal was April 7, 2006. Weisman admitted before the MSPB that she did not make the decision on removal or what other action to take within 30 day after she had received McDonald's response. (MSPB 1805:15-18.) She also testified that she was not aware of the requirements in the regulation that an agency make its final decision within 30 days of the notice period. (*Id.* 1830:17-22.)

Weisman was the deciding official concerning McDonald's demotion. (MSPB 1135-1141, Hr'g Ex. FF.) While Defendant asserts that Weisman, not Sanborn, made the decision to demote rather than remove him, Plaintiff disputes this. He points out that Defendant's motion states that the agency's reasons for its decision are set forth in Sanborn's sworn statement in EEO Docket No. 0S-06-005, Exhibit 11 to Defendant's Motion. (Def.'s Mot. ¶ 37.) Thus, Plaintiff asserts that the reasons for the demotion were Sanborn's reasons. He also points out that Weisman testified that she relied on Sanborn's impressions for her approval. (Weisman Dep. 169:6-25, 184:1-25, 186:15-25, July 8, 2009, ECF No. 47-4.)

Sanborn admitted at the hearing before the MSPB that she had never looked at McDonald's official personnel file. (MSPB 1641:4-18.) She also did not know about the numerous cash awards that McDonald had received. (*Id.*)

Weisman had made up her mind to remove McDonald on or about January 5, 2006. This is when she announced that Shauvin had been selected to fill the position of

Chief, Departmental Offices Branch, effective January 22, 2006.  On January 6, 2006, Weisman responded to the announcement of Shauvin's replacement of McDonald as follows: "That's great (and fast).  *We'll definitely need to have an answer for this selection and then removal of Maurice.* . . ." (MSPB 1052, emphasis added.)

At the time Weisman made the decision to demote McDonald, she was not aware of the fact that the Decision on Proposed Removal inaccurately states that he had failed as of July 5, 2005 to meet critical element number 1.  (MSPB 1805:19-1806:21.) Further, the PIP related to critical element numbers 1, 2, 4 and 5 while the putative November extension related only to elements 1, 2, and 4.  At the time Weisman made the decision to demote McDonald and at the hearing, she was unaware of any written document given to Plaintiff after October 10 but before November 17, 2005 that extended the PIP.  (*Id.* 1807:16-23.)  There are no memorandums in the record regarding any meetings between Sanborn and McDonald between September 12, 2005 and October 12, 2005.  Weisman acknowledged that she was surprised there were no memorandums for that time period.  (*Id.* 1824:4-23.)  Finally, Weisman never asked McDonald to explain the reasons why the sampling plan was not implemented within the time requested by Sanborn.  (Id. 1813:6-9.)

After McDonald was demoted to a GS-11, he continued to perform many of the same duties he performed when he was a GS-13, but at significantly less pay.  On numerous occasions after he was demoted, McDonald served as the temporary chief.

Shauvin testified that, when she became supervisor, she did not have adequate staffing and there were no accountants working in the payments and collection branch with McDonald.  (MSPB 1929:6-22.)  She also testified that having an accountant in the

payments and collection branch would "absolutely" have been helpful to perform some of the reconciliation tasks McDonald had been given, and that an accountant's "education and experience w[ere] necessary to perform those reconciliations." (*Id.* 1929:6-18.) She  stated that shortly after her promotion, the entire division was reorganized because "We had a lot of problems in the entire division." (*Id.* 1932:10-20.) As part of the reorganization in June of 2006, Sanborn authorized Shauvin to hire an additional GS-13 accountant as well as to bring in additional contract employees to assist. (*Id.* 1933:2-15.)

In one of the first meetings that Shauvin had with Sanborn, Sanborn informed her that she intended to fire McDonald. (MSPB 1941:9-19.) Shauvin testified that: "I don't believe she was [objective] based on that meeting because she didn't give him a chance. She had her mind already made up." (*Id.* 1941:7-12.) Shauvin did not recollect the precise date when Sanborn said that she wanted to fire McDonald, but narrowed the time frame to the week following January 22, 2006. (*Id.* 1941:14-19.)

Finally, Shauvin testified, "I felt Ms. Sanborn's deadlines [imposed on McDonald] were unreasonable because she did not understand the type of work needed to accomplish those reconciliations." (MSPB 1934:3-6.) "[Sanborn] didn't know enough about how the system worked to realize how complex a lot of the problems were and how complex it would be to accomplish these reconciliations." (*Id.* 1934:12-15.) Thus, Shauvin "spent many hours" with Sanborn attempting to explain how the accounting system worked. (*Id.* 1934:24-1935:1.) It took the work of Shauvin, a GS-14, Sanborn, a GS-15, and the newly hired GS-13 accountant to finish the reconciliations. (*Id.* 1935:16-19.)

On March 6, 2009, the MSPB issued a 33-page Initial Decision sustaining the

agency's demotion and pay increase denial decisions.  (Def.'s Mot., Ex. 12.)

III.    ANALYSIS

A.    Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the ... moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of showing that no

genuine issue of material fact exists is borne by the moving party.  *E.E.O.C. v.

Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

In reviewing a summary judgment motion, the court must view the evidence in

the light most favorable to the nonmoving party.  *Anaya v. Crossroads Managed Care

Sys., Inc.*, 195 F.3d 584 (10th Cir. 1999).  All doubts must be resolved in favor of the

existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891,

892 (10th Cir. 1991).

B.    Whether Summary Judgment is Proper as to Plaintiff's Claims

1.    Age Discrimination

"The ADEA provides, in relevant part, that '[i]t shall be unlawful for an employer

... to fail or refuse to hire or to discharge any individual or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of

employment, *because of* such individual's age.'"  *Gross v. FBL Finan. Servs., Inc.*, ___

U.S. ___, 129 S. Ct. 2343, 2350 (2009) (quoting 29 U.S.C. § 623(a)(1)) (emphasis

added).  Thus, the Supreme Court has stated to "[t]o establish a disparate-treatment

claim under the plain language of the ADEA, . . .a plaintiff must prove [by a preponderance of evidence] that age was the 'but-for' cause of the employer's adverse decision." *Id.*

*Gross* did not resolve whether the burden-shifting paradigm set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), was applicable in ADEA claims. *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1278 (10th Cir. Aug. 24, 2010). While "recogniz[ing] that *Gross* created some uncertainty regarding burden-shifting in the ADEA context", the Tenth Circuit recently concluded that *Gross* "does not preclude our continued application of *McDonnell Douglas* to ADEA claims." *Id.* Thus, an age discrimination claim can generally can be shown through direct evidence, which "demonstrates on its fact that the employment [action at issue] was discriminatory" or through circumstantial evidence "which permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination that discrimination, in fact, has occurred." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008); *see also Jones*, 617 F.3d at 1278.

"Where the plaintiff relies on circumstantial evidence, the Supreme Court has established a three step burden-shifting framework for determining whether a plaintiff's evidence raises an inference of invidious discriminatory intent sufficient to survive summary judgment." *Adamson*, 514 F.3d at 1145 (citing *McDonnell Douglas*, 411 U.S. at 802-05). In this case, Plaintiff relies on circumstantial evidence to demonstrate his claims through the *McDonnell Douglas* framework. Under that framework, to prove a prima facie case of age discrimination "a plaintiff must show: 1) []he is a member of the class protected by the [ADEA]; 2) []he suffered an adverse employment action; 3) []he

was qualified for the position at issue; and 4) []he was treated less favorably than others not in the protected class.'" *Jones*, 617 F.3d at 1279 (quoting *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 531 (10th Cir.1998)).

In this case, the only prong of a prima facie case that Defendant disputes is the adverse element prong, and I find that the other prongs are satisfied. Defendant asserts that any criticism of Plaintiff on July 5, 2005 or otherwise, the September 9, 2005 letter of reprimand and the placement of McDonald on a PIP do not constitute adverse actions. That is because, according to Defendant, McDonald does not allege (and the record does not reflect) that he suffered any change in his employment status as a result of these actions, such as a change in pay or his job status.

In response to Defendant's motion, Plaintiff asserts that he does not allege that the letter of reprimand was the adverse action; instead, the focus in his complaint is on the demotion. Since Plaintiff is not relying on the letter of reprimand or related actions raised by Defendant, Defendant's Motion for Summary Judgment as to these actions is denied as moot. As to the demotion which caused Plaintiff to suffer a $35,393 decrease in salary, this is clearly an adverse action as it is a decision causing Plaintiff a significant loss of wages. *See Sanchez*, 164 F.3d at 532. Defendant does not dispute this. Accordingly, I find that Plaintiff has established a prima facie case of discrimination.

Since Plaintiff "has demonstrated a prima facie case of age discrimination, the burden of production then shifts back to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action." *Jones*, 617 F.3d at 1278. I find that Defendant has met its burden through its assertion that it took reasonable measures in regard to Plaintiff's employment, including the demotion, in the

face of his unsatisfactory work performance.  Accordingly, the burden shifts back to Plaintiff to prove Defendant's proffered reason was pretextual.  *Id.*  Defendant disputes in this case that Plaintiff has shown pretext.  I disagree, finding that Plaintiff met his burden on this issue.

"A plaintiff shows pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons."  *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quotation omitted).  "One typical method for a plaintiff to prove pretext is by providing direct 'evidence that the defendant's stated reason for the adverse employment action was false.'"  *Id.* (quotation omitted).  "Evidence of pretext may also take a variety of other forms, and the plaintiff 'may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual.'"  *Id.* at 1168 (quotation omitted).

In the instant case, Plaintiff has presented evidence that demonstrates weaknesses, falsities or implausibilities in Defendant's proffered reason for its actions.  First, Weisman's decision on Proposed Removal notes incorrectly as a basis for his removal that his performance on critical element number 1 fell below the "Minimally Successful" when in fact it did not.  Thus, this reason for the decision has been shown to be false or incorrect.  Also, the Decision of Proposed Removal faults McDonald for not "immediately" putting in place a new procedure to audit vouchers in connection with the sampling plan and suggests that a few weeks delay was unacceptable.  (MSPB

1137, Hr'g Ex. FF.)  Sanborn admitted in her deposition, however, that a statistical sampling plan was a project that took approximately two months to put into fruition. Sanborn also admitted that McDonald had made his best efforts to get the statistical sampling plan completed on time.  Thus, a factfinder could find this reason given in the Notice of Removal to be implausible.

Weisman also states in the Decision of Proposed Removal that "In determining the appropriate action to take, I have considered your work record and all other factors presented in your response."  (MSPB 1139, Hr'g Ex. FF.)  However, evidence presented by Plaintiff suggests that Weisman had made the decision to remove him well before his response was provided.  I also note that Plaintiff has presented evidence that Sanborn knew that Plaintiff's department was overworked and understaffed during at least part of the same time period and refused Plaintiff's requests to hire additional help.  However, when Shauvin, a younger female took over, she then hired extra personnel.  This could support an inference that the employer was not acting reasonably in its decision to demote Plaintiff.

Plaintiff also presents argument of procedural irregularities associated with his demotion.  This includes Defendant's failure to make a final decision on the Notice of Proposed Removal given to him on February 27, 2006, within 30 days of the responsive information to the Notice as required by 5 C.F.R. § 432.105(b), failure to document that Plaintiff was notified within 30 days of December 7, 2005 that his performance was still at an unacceptable level as required by the November 17, 2005 Memorandum, and failure to document before the PIP's expiration on October 10, 2005 that it was extended (which did not occur until November 17, 2005).  Also, pursuant to 5 C.F.R.

§ 432.105(a)(4)(ii), the agency is required to give an employee a reasonable time to answer the agency's notice of proposed action. Here, Plaintiff points to evidence that Weisman and Sanborn had already made up their minds about removing McDonald from his position well before they even gave him the notice of the proposed removal. Indeed, the evidence shows that they had made up their minds about this issue as of January 6, 2006, when Sanborn announced that Shauvin had been elected to fill the position of Chief, Departmental Services Branch.

Pretext may arise on the basis of a procedural irregularity, if there is "some evidence that the irregularity 'directly and uniquely disadvantaged a minority employee.'" *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1213 (10th Cir. 2010). Here, the evidence supports a finding that the procedural irregularities directly and uniquely disadvantaged Plaintiff, a person in the protected age group, since the decision to remove him from office was made before he had an opportunity to address the employer's decision as required by law. Further, the failure to timely alert Plaintiff that his performance was still felt to be deficient after expiration of the PIP and of the 30 day period at issue in the November 17 Memorandum could well have disadvantaged him. He could reasonably have believed that because Defendant allowed these periods to expire without notifying him of continued deficient performance, his performance was acceptable. As such, he may have acted in a different manner in regard to work performance than he would have if he knew that the employer still had problems with his work.

Finally, another "common method" of demonstrating pretext "is a differential treatment argument, in which the plaintiff demonstrates that the employer 'treated [him]

differently from other similarly-situated employees who violated work rules of comparable seriousness' in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff." *Swackhammer*, 493 F.3d at 1167-68 (quotation omitted). Plaintiff presented evidence that he was treated differently than Susan Williams, a younger female who also reported to Sanborn. While Defendant argues that they had different duties, Plaintiff reports that he and Ms. Williams had the same tasks for a single department. Construing the evidence in the light most favorable to Plaintiff for purposes of this motion, I find that this evidence also supports a finding of pretext.

As Plaintiff has demonstrated a prima facie case of discrimination and pretext, Defendant's Motion for Summary Judgment is denied as to the age discrimination claim.

### 2. Gender Discrimination Claim

For a woman to prove gender discrimination, she must show that: (1) she belonged to the protected class, (2) she suffered adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than her male counterparts. *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10th Cir. 1994). McDonald, as a male, is not a member of the protected class as required to establish a prima facie case. Thus, the Tenth Circuit holds that "[v]iewing [the male employee's] allegations through the *McDonnell Douglas* paradigm . . . is to no avail." *Adamson*, 514 F.3d at 1149.

A male employee is not entitled to rely on the *McDonnell Douglas* burden-shifting framework because "the presumption of invidious intent created by establishing a prima facie case under *McDonnell Douglas* arises precisely *because* the plaintiff belongs to a

disfavored group." *Adamson*, 514 F.3d at 1149 (emphasis in original) "When plaintiff is not a member of a historically favored group, by contrast, an inference of invidious intent is warranted only when 'background circumstances suggest the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* (quotation and internal quotation marks omitted).

Thus, for Plaintiff to establish a claim of reverse gender discrimination, he must "prove through direct evidence and without reference to *McDonnell Douglas*, that his termination was, in fact, motivated by the fact that he is a man." *Adamson*, 514 F.3d at 1149. "It is not enough. . . for a plaintiff merely to allege that he was a qualified man who was treated differently than a similarly situated woman." *Id.* "Instead, he must allege and produce evidence sufficient to support a reasonable inference that, *but for* his status as a man, the challenged decision would not have occurred." *Id.* (emphasis in original).

Defendant's motion and reply brief do not state the correct standard for a reverse gender discrimination claim. While Defendant argues that Plaintiff does not have direct evidence of age or gender discrimination, it also argues that Plaintiff has not met his burden under *McDonnell Douglas* as he did not demonstrate a prima facie case of gender discrimination through showing adverse actions or pretext. In his reply brief, Plaintiff only addressed the issues regarding whether he met his burden under the *McDonnell Douglas* framework. While I find for the reasons discussed above in connection with the ADEA claim that Plaintiff did demonstrate adverse action and pretext, those are not at issue in a reverse gender discrimination claim. Instead, as discussed above, the issue is whether Plaintiff has direct evidence to support his claim.

I am unable to determine from the briefing whether Plaintiff has direct evidence to support his gender discrimination claim.  While it does not appear that he presented such  direct evidence, he may have reasonably believed he did not need to since it was assumed that he could present circumstantial evidence to support his claim through the *McDonnell Douglas* framework.  Since all doubts must be resolved in favor of the existence of triable issues of fact, Defendant's Motion for Summary Judgment is denied on this claim.  The issue of whether Plaintiff has sufficient evidence to support his reverse gender discrimination claim is deferred to trial.

### 3.    Retaliation

Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation nor show that Defendant's legitimate, non-discriminatory reasons for any adverse action taken against him are pretextual.  "To establish a prima facie case of retaliation, [a plaintiff] must show (1) he engaged in protected opposition to discrimination, (2) he suffered a materially adverse action either after or contemporaneous with the protected activity; and (3) a causal connection exists between the protected activity and the adverse action.  *Reinhardt v. Albuquerque Pub. Schs. Bd. of Education*, 595 F.3d 1126, 1131 (10th Cir. Feb. 16, 2010). An adverse action is materially adverse if can be shown by Plaintiff "'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)).

Here McDonald engaged in a protected activity when he initiated EEO counseling relating to the Letter of Reprimand and PIP.  He continued to engage in protected

activities by amending his EEO complaint and by responding to Sanborn's Notice of Proposed Removal. *See, e.g., Burlington N.*, 548 U.S. at 59 (testifying or participating in a Title VII investigation constitutes a protected activity). Further, I previously found that McDonald's demotion was an adverse action, and I find that it qualifies as material since such a demotion might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. Defendant does not dispute these elements. Instead, it disputes only whether there is a causal connection between the protected activity and the adverse action.

There is evidence that supports a causal connection between McDonald's protected activity and the adverse action. Sanborn first reprimanded McDonald on September 12, 2005, four days after he initiated EEO counseling on September 8, 2005. Sanborn belatedly "extended" McDonald's PIP on November 17, 2005, three days after he raised a claim of reprisal. Sanborn then gave McDonald a poor Performance Appraisal less than three weeks after he filed his complaint of discrimination. (*See* Causal Connection Timeline, ECF No. 47-3.) Also, McDonald filed a complaint of discrimination on December 21, 2005, after which on January 9, 2006, Sanborn gave McDonald the Employee Performance Appraisal that rated his performance as unsatisfactory. (*Id.*) While Plaintiff does not claim that the above retaliatory actions were adverse actions, they are relevant to show a pattern between protected conduct and retaliation. *See Goldstein v. Sprint United Mgmt. Co.*, 288 Fed. Appx. 476, 483 (10th Cir. 2008) (unpublished opinion) ("This court has recognized that the 'close temporal proximity' usually necessary to support a retaliation claim 'must not be read too restrictively where the pattern of retaliatory conduct begins . . .soon after

the filing of [a] complaint and only culminates later in actual discharge'") (quoting *Marx*

*v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996)).

Finally, Sanborn proposed removing McDonald through the Notice of Proposed

Removal of February 27, 2006, only a few weeks after McDonald amended his EEO

complaint to include the poor appraisal.  (See letter amending the discrimination

complaint received by OCR HR on February 2, 2006, ECF No. 47-1.)  Given the

proximity in time between McDonald's protected activity in amending his EEO complaint

and the Notice of Proposed Removal, I find that McDonald has established a causal

connection between the two.  *See E.E.O.C. v. PVNF, L.L.C,* 487 F.3d 790, 804 (10th

Cir. 2007) ("temporal proximity, alone, is sufficient to allow an inference of the existence

of a causal connection"); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th

Cir. 1999) (indicating that six weeks between protected activity and adverse action gives

rise to an inference of causation).[2]  Further, "[g]ranting plaintiff the benefit of every

favorable inference, the pattern of actions taken by defendant precludes summary

judgment concerning defendant's motivation in demoting plaintiff . . . ."  *Marx*, 76 F.3d at

329.[3]

---

[2] While the actual final decision to demote did not occur until July 2005, this was based on the fact that the federal regulations require time for an employee to respond before a final decision is made.  The time requirements in the regulations applicable to federal agencies often mean that the agency's final decision on the adverse action can be months from when the initial decision to take action is made and would rarely support a showing of temporal proximity.  Under these circumstances, I look to the date of the initial decision by the employer to take adverse action in deciding the proximity issue.

[3] Defendant raised for the first time in its reply brief an argument that Plaintiff offers no proof to suggest that his supervisor Sanborn knew about his EEO contact prior to presenting him with the initial letter of reprimand.  Defendant does not dispute, however, that Sanborn knew of his EEO contact in connection with later retaliatory actions.  Further, as this argument was raised for the first time in a reply brief, I decline to consider such argument.  *Spacecon Speciality Contractors, LLC v. Bensinger*, No. 09-cv-02080-REB-KLM, 2010 WL 3927783, at *2 n. 2 (D. Colo. Oct. 1, 2010).

Since a prima facie case is established the burden shifts to Defendant to produce evidence of a legitimate reason for the action. *Reinhardt*, 595 F.3d at 1131. If the employer does so, the burden shifts back to Plaintiff to show pretext. *Id.* In this case, I found in Section III.B.1, *supra,* that Defendant presented a legitimate reason for the demotion and that Plaintiff demonstrated pretext. I incorporate those findings here. Having found a prima facie case and pretext, I deny summary judgment on the retaliation claim.

IV. <u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment is **DENIED** as to the first, second and third claims asserting discrimination and **DENIED WITHOUT PREJUDICE** as to the fourth and fifth claims asserting appeals of decisions of the MSPB. The fourth and fifth claims will be addressed in a separate Order in connection with Plaintiff's Motion for Summary Judgment.

Dated: October 29, 2010

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge